UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------

MAGDALENO ROCHA, *individually and on
behalf of others similarly situated*,

Plaintiff,

v.

BAKHTER AFGHAN HALAL KABABS, INC.,
d/b/a BAKHTER AFGAN HALAL KABABS,
WAZIR KHITAB, ABASEEN FOOD CORP., d/b/a
BAKHTER AFGHAN HALAL KABABS, INC.,
NAWAZ KHAN-NABI and HABIB KHAN,

Defendants.
-------------------------------------------------------------

**MEMORANDUM & ORDER**
13-CV-170 (MKB)

MARGO K. BRODIE, United States District Judge:

Plaintiff Magdaleno Rocha commenced this action individually and on behalf of others

similarly situated on January 11, 2013, against Defendants Bakhter Afghan Halal Kababs, Inc.,

doing business as Bakhter Afghan Halal Kababs, and Wazir Khitab, alleging minimum wage and

overtime violations of the Fair Labor Standards Act, 29 U.S.C. §§ 201 *et seq*., and minimum

wage, overtime and spread-of-hours violations of New York Labor Law § 652 and regulations,

12 N.Y. Comp. Codes R. & Regs. § 142-2.2, and seeking certification of the action as a

collective action pursuant to the Fair Labor Standards Act, 29 U.S.C. § 216(b).  On July 11,

2013, and September 17, 2013, Mateo Calel and Miguel Portillo consented to join this action,

respectively, as opt-in plaintiffs pursuant to 29 U.S.C. § 216(b).  (Docket Entry Nos. 12, 15.)

Plaintiffs filed an Amended Complaint on February 4, 2013, (Docket Entry No. 4), adding

Defendants Abaseen Food Corp., doing business as Bakhter Afghan Halal Kababs, Nawaz Khan-

Nabi and Habib Khan. (Docket Entry No. 4.) Plaintiffs filed a Second Amended Complaint on

April 17, 2014, (Docket Entry No. 10), adding an allegation of retaliatory termination against

Defendant Khan. The Court allowed limited discovery. Defendants now move to dismiss the

Amended Complaint[1] for lack of subject matter jurisdiction and for failure to state a claim, and,

in the alternative, for summary judgment. For the reasons set forth below, the Court denies

Defendants' motions.

## I. Background

Defendants are owners and operators of the Bakhter Afghan Halal Kababs Restaurant

(the "Restaurant"), located in Flushing, Queens.[2] (Am. Compl. ¶ 21.)[3] Rocha began working

for Defendants at the Restaurant in June 2006, working on the grill and preparing plates with

cooked food to serve Restaurant customers. (*Id.* at 9 ¶¶ 36–37.) Rocha typically worked 66

hours each week. (*Id.* at 9–10 ¶¶ 42–45.) He was paid his wages in cash, and was initially paid

$400 each week. This amount increased every 6 to 18 months, and beginning in September

2011, Rocha was paid $650 each week. (*Id.* ¶¶ 48–54.) Rocha's weekly pay did not vary even

when Rocha worked longer than his typical hours. (*Id.* ¶ 56.) Rocha was not provided with any

break periods, and was never required to keep track of his time. (*Id.* ¶ 57.) Defendants did not

---

[1] Plaintiffs did not seek leave to file their Second Amended Complaint, which adds a paragraph with a factual allegation that Khan, upon learning of the instant action, "refused to pay Plaintiff Rocha for [Rocha's] last week of work, . . . forced him to sign a paper directing him to withdraw from the lawsuit and terminated [Rocha] when [Rocha] refused." (Second Am. Compl. ¶ 60.) Defendants appear to move to dismiss the Amended Complaint rather than the Second Amended Complaint. (*See* Def. Mem. 1–2.)

[2] The facts alleged by Plaintiffs are assumed to be true for the purposes of these motions.

[3] The Amended Complaint is not consecutively numbered. After paragraph 44 on page 9, the paragraph enumeration returns to "36". To avoid confusion, for citations between paragraphs 36 and 44, the Court refers to both the page number and the paragraph number.

utilize any devices to keep track of the hours worked by employees, did not provide Rocha with any documentation of his hours worked, and did not post any notices or provide any other notification of statutory overtime and wage requirements. (*Id.* ¶¶ 57–59.) Rocha seeks to represent a class of similarly situated individuals, who were also subject to the requirements to work in excess of 40 hours each week without being paid minimum wages, overtime compensation or spread-of-hours pay.[4] (*Id.* at 9 ¶ 44, ¶¶ 60–68.)

Calel worked for Defendants from July 2011 until August 2013 as a general helper and kitchen preparation worker. (Declaration of Mateo Calel in Opposition to Defendants' Motion for Summary Judgment ("Calel Decl.") ¶ 3.) Calel worked 6 days each week, generally 11½ hours on weekdays, and 12 hours on Fridays and Saturdays, for a total of approximately 70 hours each week. (*Id.* ¶ 4.) Calel was paid a cash salary that began at $400 each week at the beginning of his employment, and increased to $575 each week. (*Id.* ¶¶ 5, 14.) Calel did not receive a statement of hours worked or wages paid, and he was not paid overtime for any work. (*Id.* ¶¶ 6–7.)

Portillo worked for Defendants from April 2011 until June 23, 2013, as a dishwasher, general helper and kitchen preparation worker. (Affidavit of Miguel Portillo in Opposition to Defendants' Motion for Summary Judgment ("Portillo Aff.") ¶ 3.) Portillo worked 6 days each week, generally 11½ hours on the weekdays and 12 hours on Fridays and Saturdays, for a total of approximately 70 hours each week. (*Id.* ¶ 4.) Portillo was paid a weekly salary in cash, which began at $400 each week and increased to $600 each week. (*Id.* ¶ 5.) Portillo did not receive a

---

[4] In the Second Amended Complaint, Rocha alleges that after he commenced this action, Khan refused to pay him for his last week of work and demanded that Rocha sign a paper withdrawing from the lawsuit. (Second Amended Complaint ¶ 60.) When Rocha refused, Khan terminated him. (*Id.*)

statement of hours worked or wages paid, and he was not paid overtime for any work.  (*Id.* ¶¶ 6–7.)

## II. Discussion

### a. Standards of Review

#### i. Rule 12(b)(1)

"[A] district court may properly dismiss a case for lack of subject matter jurisdiction under Rule 12(b)(1) if it lacks the statutory or constitutional power to adjudicate it." *Shabaj v. Holder*, 704 F.3d 234, 237 (2d Cir. 2013) (alteration in original) (quoting *Aurecchione v. Schoolman Transp. Sys., Inc.*, 426 F.3d 635, 638 (2d Cir. 2005)).  "'[T]he court must take all facts alleged in the complaint as true and draw all reasonable inferences in favor of plaintiff,' but 'jurisdiction must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it.'"  *Morrison v. Nat'l Austl. Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008) (alteration in original) (citations omitted), *aff'd*, 561 U.S. 247 (2010).  A court may consider matters outside of the pleadings when determining whether subject matter jurisdiction exists.  *M.E.S., Inc. v. Snell*, 712 F.3d 666, 671 (2d Cir. 2013); *Romano v. Kazacos*, 609 F.3d 512, 520 (2d Cir. 2010); *Morrison*, 547 F.3d at 170.

#### ii. Rule 12(b)(6)

In reviewing a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, the court "must take all of the factual allegations in the complaint as true."  *Pension Ben. Guar. Corp. ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 717 (2d Cir. 2013) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)); *see also Lundy v. Catholic Health Sys. of Long Island Inc.*, 711 F.3d 106, 113 (2d Cir. 2013) (quoting *Holmes v. Grubman*, 568 F.3d 329, 335 (2d Cir. 2009)); *Matson v. Bd. of Educ.*, 631

F.3d 57, 63 (2d Cir. 2011) (quoting *Connecticut v. Am. Elec. Power Co.*, 582 F.3d 309, 320 (2d Cir. 2009)).  A complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Matson*, 631 F.3d at 63 (quoting *Iqbal*, 556 U.S. at 678); *see also Pension Ben. Guar. Corp.*, 712 F.3d at 717–18.  "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged — but it has not 'show[n]' — 'that the pleader is entitled to relief.'" *Pension Ben. Guar. Corp.*, 712 F.3d at 718 (alteration in original) (quoting *Iqbal*, 556 U.S. at 679).  Although all allegations contained in the complaint are assumed true, this principle is "inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678.

### iii.   Rule 56(b)

Summary judgment is proper only when, construing the evidence in the light most favorable to the non-movant, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Bronzini v. Classic Sec., L.L.C.*, 558 F. App'x. 89, 89 (2d Cir. 2014); *Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843 (2d Cir. 2013); *Kwong v. Bloomberg*, 723 F.3d 160, 164–65 (2d Cir. 2013); *Redd v. N.Y. Div. of Parole*, 678 F.3d 166, 174 (2d Cir. 2012).  The role of the court is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Cioffi v. Averill Park Cent. Sch. Dist. Bd. of Educ.*, 444 F.3d 158, 162 (2d Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).  A genuine issue of fact exists when there is sufficient "evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252.  The "mere existence of a scintilla of evidence" is not sufficient to

defeat summary judgment; "there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* The court's function is to decide "whether, after resolving all ambiguities and drawing all inferences in favor of the non-moving party, a rational juror could find in favor of that party." *Pinto v. Allstate Ins. Co.*, 221 F.3d 394, 398 (2d Cir. 2000).

### b. Defendants' motion to dismiss the FLSA claims

The Fair Labor Standards Act (FLSA) provides federal minimum wage and overtime protections for employees that fall within its scope. *See* 29 U.S.C. § 206 (minimum wage) and § 207 (overtime). The FLSA was enacted to "correct and . . . eliminate" "conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers." 29 U.S.C. § 202(a)–(b); *Jacobs v. New York Foundling Hosp.*, 577 F.3d 93, 97 (2d Cir. 2009). "In turn, courts construe the FLSA 'liberally to apply to the furthest reaches consistent with congressional direction.'" *Jacobs*, 577 F.3d at 97 (quoting *Tony & Susan Alamo Found. v. Sec'y of Labor*, 471 U.S. 290, 296 (1985)).

The minimum wage and overtime provisions of the FLSA apply to employees who are either (1) "engaged in commerce or in the production of goods for commerce," (individual coverage) or (2) "employed in an enterprise engaged in commerce or in the production of goods for commerce" (enterprise coverage). 29 U.S.C. § 206(a) and § 207(a)(1); *Dejesus v. HF Mgmt. Servs., LLC*, 726 F.3d 85, 86 (2d Cir. 2013) *cert. denied*, 572 U.S. ---, 134 S. Ct. 918 (2014); *Jacobs*, 577 F.3d at 96 ("The FLSA requires that employers pay a premium or overtime wage . . . if an employee either: 1) 'is engaged in commerce or in the production of goods for commerce,' or 2) 'is employed in an *enterprise* engaged in commerce or in the production of goods for commerce.' The two categories are commonly referred to as 'individual' and 'enterprise' coverage." (quoting 29 U.S.C. § 207 (a)(1))).

Defendants argue that if Plaintiffs cannot show that they fall within the ambit of the FLSA under the enterprise coverage theory — by showing that the Restaurant is an "enterprise engaged in commerce" — the case should be dismissed for lack of subject matter jurisdiction.[5] (Def. Mem. 4; Def. Reply 1–2.) Plaintiffs argue that whether the Restaurant is an enterprise engaged in commerce is not a jurisdictional issue, but rather is an element of Plaintiffs' claim that must be decided on the merits and not on a Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction.[6] (Portillo Opp'n Mem. 2–3; Rocha Opp'n Mem. 6–7.)

The Second Circuit has held that "[f]or the purpose of determining whether a district court has federal question jurisdiction pursuant to Article III and 28 U.S.C. § 1331 [federal question jurisdiction], the jurisdictional inquiry 'depends entirely upon the allegations in the complaint' and asks whether the claim as stated in the complaint 'arises under the Constitution or

---

[5] The Amended Complaint does not expressly state under what theory the FLSA applies to Plaintiffs. Nor do Defendants' moving papers make clear whether Defendants are moving to dismiss based on both lack of enterprise and individual coverage, or solely on the basis of enterprise coverage. (*Compare* Def. Mem. 1 (discussing both individual and enterprise theory), *with* Def. Reply 1 (discussing only enterprise theory); *see also* Def. Mem. 5 (purporting to discuss enterprise theory, but citing only individual theory provisions of the statute and case law).) However, the factual allegations suggest that Plaintiffs are invoking the enterprise theory. (*See* Am. Compl. at 8 ¶¶ 41–42, 9 ¶ 39.) The Court addresses only the enterprise theory.

[6] This issue is not merely academic, in part because the burdens of production and proof are dependent on whether the Court resolves the question of enterprise coverage on a Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction (which places the burden on Plaintiffs to affirmatively establish jurisdiction), or on a Rule 12(b)(6) motion to dismiss for failure to state a claim, or a Rule 56 motion for summary judgment, both of which place some burden on Defendants, and require the Court to review the evidence in the light most favorable to Plaintiffs. *See also Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006) (discussing the importance of distinguishing the question of subject matter jurisdiction from the merits of a plaintiff's claim, and noting, *inter alia*, that "if subject-matter jurisdiction turns on contested facts, the trial judge may be authorized to review the evidence and resolve the dispute on her own," whereas "[i]f satisfaction of an essential element of a claim for relief is at issue, however, the jury is the proper trier of contested facts"); *Da Silva v. Kinsho Int'l Corp.*, 229 F.3d 358, 361 (2d Cir. 2000) (discussing reasons why "[t]he jurisdiction/merits issue can assume importance").

laws of the United States.'" *Burke v. Lash Work Environments, Inc.*, 408 F. App'x 438, 440 (2d

Cir. 2011) (quoting *S. New Eng. Tel. Co. v. Global NAPs* Inc., 624 F.3d 123, 132 (2d Cir. 2010));

*see also Bay Shore Union Free Sch. Dist. v. Kain*, 485 F.3d 730, 734 (2d Cir. 2007) ("A case

arises under federal law within the meaning of § 1331 . . . if a well-pleaded complaint establishes

either that federal law creates the cause of action or that the plaintiff's right to relief necessarily

depends on resolution of a substantial question of federal law." (quoting *Empire Healthchoice*

*Assur., Inc. v. McVeigh*, 547 U.S. 677, 690 (2006))).  Once this is established, the federal court

has jurisdiction "unless the purported federal claim is clearly 'immaterial and made solely for the

purpose of obtaining jurisdiction' or is 'wholly insubstantial and frivolous.'" *S. New. Engl. Tel.*

*Co.*, 624 F.3d at 132 (quoting *Carlson v. Principal Fin. Grp.*, 320 F.3d 301, 306 (2d Cir. 2003)).

Defendants argue that the Court lacks subject matter jurisdiction because Plaintiffs have

failed to establish that they are entitled to FLSA coverage under the enterprise theory.  However,

whether Plaintiffs can establish coverage is an element of Plaintiffs' claim and is not

determinative of the Court's jurisdiction.  The Second Circuit recognizes that:

> [W]hether a plaintiff has pled a jurisdiction-conferring claim is a
> wholly separate issue from whether the complaint adequately states
> a legally cognizable claim for relief on the merits. . . . Thus a
> *defense,* however valid, does not oust the district court of subject
> matter jurisdiction. This is because once the court's jurisdiction has
> been properly invoked in the plaintiff's complaint, the assertion of
> such a defense is relevant only to whether the plaintiff can make
> out a successful claim for relief, and not to whether the court has
> original jurisdiction over the claim itself.

*S. New Engl. Tel. Co.*, 624 F.3d at 132; *see also Arbaugh v. Y&H Corp.*, 546 U.S. 500, 516

(2006) ("[W]hen Congress does not rank a statutory limitation on coverage as jurisdictional,

courts should treat the restriction as nonjurisdictional in character.").

Several courts in this Circuit have found that the question of whether defendants in a

FLSA action meet the statutory definition of "enterprise engaged in commerce" is not a

jurisdictional question, but rather goes to the merits of the claim. *See Jia Hu Qian v. Siew Foong Hui*, No. 11-CV-5584, 2012 WL 1948820, at *2 (S.D.N.Y. May 30, 2012) ("The question of whether or not Defendants actually are an 'enterprise engaged in commerce' within the meaning of 29 U.S.C. § 203(s)(1) is an issue that goes to the merits of Plaintiff['s] claims rather than the Court's subject matter jurisdiction." (quoting *Velez v. Vassallo*, 203 F. Supp. 2d 312, 332 (S.D.N.Y. 2002))); *Monterossa v. Martinez Rest. Corp.*, No. 11-CV-3689, 2012 WL 3890212, at *3 (S.D.N.Y. Sept. 7, 2012) ("The question of whether or not Defendants actually are 'an enterprise engaged in commerce' within the meaning of 29 U.S.C. § 203(s)(1) is an issue that goes to the merits of Plaintiffs' claims rather than [to] the Court's subject matter jurisdiction." (alteration omitted) (quoting *Velez*, 203 F. Supp. 2d at 332)); *Benitez v. F & V Car Wash, Inc.*, No. 11-CV-01857, 2012 WL 1414879, at *1 (E.D.N.Y. Apr. 24, 2012) ("[T]he question of whether a defendant qualifies as an enterprise under the FLSA is not a jurisdictional issue, but an element that a plaintiff must establish in order to prove liability." (collecting cases)); *Romero v. Jocorena Bakery, Inc.*, No. 09-CV-5402, 2010 WL 4781110, at *3 (E.D.N.Y. Nov. 23, 2010) ("While plaintiffs will have to ultimately prove that defendants grossed more than $500,000 in annual sales in order to be successful on their FLSA claims, the Court 'has jurisdiction over plaintiffs' FLSA claims irrespective of whether plaintiffs can ultimately prevail on the merits.'" (quoting *Padilla v. Manlapaz*, 643 F. Supp. 2d 298, 301 (E.D.N.Y. 2009))); *Padilla*, 643 F. Supp. 2d at 301 ("[T]here is nothing in the text of the FLSA that expresses a congressional intent to make the $500,000 requirement jurisdictional in nature.").

Defendants assert that "enterprise coverage is a jurisdictional issue," but rely on case law that almost uniformly addresses this issue as one of the elements of the plaintiffs' claims, or that characterize the $500,000 annual income requirement as a "jurisdictional" issue but resolved the

dispute on a Rule 56 motion for summary judgment, addressing whether there were material issues of fact regarding the defendants' income, rather than on a Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction.[7] *See Alvarez v. 40 Mulberry Rest., Inc.*, No. 11-CV-9107, 2012 WL 4639154, at *4 (S.D.N.Y. Oct. 3, 2012) (extending discovery and granting defendant leave to move for summary judgment "on the issue of whether Asia Roma was an 'enterprise engaged in commerce' during the years it employed Alvarez"); *Yang Li v. Ya Yi Cheng*, No. 10-CV-4664, 2012 WL 1004854, at *4 (E.D.N.Y. Jan. 6, 2012) (granting summary judgment to defendants after finding "no evidence that defendant Lucky Grand Hunan Chinese Restaurant had gross revenues in excess of $500,000"), *report and recommendation adopted*, No. 10-CV-4664, 2012 WL 1004852 (E.D.N.Y. Mar. 23, 2012); *Xelo v. Mavros*, No. 03-CV-3665, 2005 WL 2385724, at *3–4 (E.D.N.Y. Sept. 28, 2005) (granting summary judgment after finding that "defendants have met their burden of demonstrating that there is no question of material fact

---

[7] Defendants' citation to *Gulf Oil Corp. v. Copp Paving Co., Inc.*, 419 U.S. 186 (1974) to argue that the Supreme Court has "weighed in on the notion that, at the very least, interstate commerce requirements are jurisdictional requirements and not elements of the claim" is without merit. In addition to the fact that *Gulf Oil Corp.* dealt with the Clayton Act, not the FLSA, in the language cited by Defendants, the Supreme Court was only "*assuming* that the interstate commerce requirements of [the Clayton Act] are properly deemed issues of subject-matter jurisdiction, rather than simply necessary elements of the federal claims . . . ." *Gulf Oil Corp.*, 419 U.S. at 203 n.19 (emphasis added). The Court went on to explain that there was neither any "objection to reserving the jurisdictional issues until a hearing on the merits," nor any "objection to [the] use, in appropriate cases, of summary judgment procedure to determine whether there is a genuine issue of material fact as to the interstate commerce elements." *Id*. In other words, the Supreme Court was suggesting the precise opposite of Defendants' assertion — that even if interstate commerce requirements were properly considered to be a question of subject matter jurisdiction, there are reasons to assess the question through a hearing on the merits, or through summary judgment, rather than through a Rule 12(b)(1) motion.

with regard to [whether the defendants'] annual income" was in fact under $500,000, but referring to the $500,000 figure as a " jurisdictional threshold").[8]

Plaintiffs' Amended Complaint, invoking 28 U.S.C. § 1331, seeks relief pursuant to a federal law, the FLSA. Defendants do not argue, and there is nothing to suggest, that the FLSA claim is immaterial, made solely for the purpose of obtaining jurisdiction, or is wholly insubstantial or frivolous. Accordingly, the Amended Complaint "arises under" the laws of the United States, and because it does, the Court has subject matter jurisdiction. Defendants' motion to dismiss the Amended Complaint for lack of subject matter jurisdiction is denied.

### c. Defendants' motion for summary judgment

Defendant moves to dismiss the Amended Complaint for failure to state a claim, or, in the alternative, for summary judgment, arguing that Plaintiffs have failed to establish that the Restaurant is an "enterprise" within the meaning of the FLSA.[9] (Def. Mem. 3–4.) Because both

---

[8] Defendants also cite *Bowrin v. Catholic Guardian Soc.*, 417 F. Supp. 2d 449 (S.D.N.Y. 2006), but that case addressed individual rather than enterprise coverage. *See Bowrin*, 417 F. Supp. 2d at 466 (denying summary judgment on issue of individual coverage). The only case cited by Defendants addressing enterprise coverage that is to the contrary is *Lamont v. Frank Soup Bowl, Inc.*, No. 99-CV-12482, 2001 WL 521815 (S.D.N.Y. May 16, 2001), which found that "[b]ecause Plaintiff is not covered by the provisions of the FLSA, this court lacks subject matter jurisdiction over the action and the Complaint must be dismissed." *Lamont*, 2001 WL 521815, at *5. *Lamont* was decided prior to *Arbaugh*, and, in light of the express direction from the Second Circuit and the Supreme Court to look solely to the well-pleaded complaint to determine subject matter jurisdiction, and the weight of district court authority treating the question of enterprise coverage as an element of a plaintiff's claim, the Court declines to follow *Lamont*.

[9] Plaintiffs argue that Defendants' failure to submit a statement of undisputed facts pursuant to Local Civil Rule 56.1 is adequate grounds to deny summary judgment. (Rocha Opp'n Mem. 8.) Defendants included a statement of undisputed facts in their reply brief, which fails to comply with the requirement of Local Rule 56.1 by failing to cite to "evidence which would be admissible . . . ." Local Rule 56.1(d). However, "[a] district court has broad discretion to determine whether to overlook a party's failure to comply with local court rules." *Pensionsversicherungsanstalt v. Greenblatt*, 556 F. App'x 23, 25 (2d Cir. 2014), *as amended*, (Mar. 5, 2014). The Court declines to deny summary judgment solely on the basis of

parties rely on documents outside the four corners of the Complaint, the Court treats Defendants'

motion as a Rule 56 motion for summary judgment.

The FLSA defines "enterprise engaged in commerce or in the production of goods for

commerce," as a business that (1) has employees "engaged in commerce or in the production of

goods for commerce, *or* that has employees handling, selling, or otherwise working on goods or

materials that have been moved in or produced for commerce by any person" *and* (2) has an

annual gross revenue of at least $500,000.  29 U.S.C. § 203(s)(1)(A) (emphasis added).

### i.   Plaintiffs satisfy the first prong of enterprise coverage

The first prong of this definition is relatively easy to establish.  Several courts have held

that it is satisfied "if Plaintiffs merely handled supplies or equipment that originated out-of-

state." *Rodriguez v. Almighty Cleaning, Inc.*, 784 F. Supp. 2d 114, 121 (E.D.N.Y. 2011); *see*

*Jacobs*, 577 F.3d at 99 n.7 (noting that requirement that an employer be an enterprise engaged in

commerce "is rarely difficult to establish . . . because it is met by showing that two or more

employees have 'handl[ed] . . . materials that have been moved in . . . commerce[.]"  (alteration

in *Jacobs*) (quoting 29 U.S.C. § 203(s)(1)(A)(i) and citing *Wirtz v. Melos Constr. Corp.*, 408

F.2d 626, 628 (2d Cir. 1969) and *Archie v. Grand Cent. P'ship*, 997 F. Supp. 504, 530 (S.D.N.Y.

1998))); *Velez*, 203 F. Supp. 2d at 328 ("[T]he employee does not himself need to be involved in

an activity that affects interstate commerce'; even a 'local laundry' is covered if the soap it uses

moved in interstate commerce" (quoting *Boekemeier v. Fourth Universalist Soc'y in City of New*

*York*, 86 F. Supp. 2d 280, 285 (S.D.N.Y. 2000) and *Marshall v. Baker*, 500 F. Supp. 145, 151

(N.D.N.Y. 1980))).  An employee's handling of cleaning and janitorial supplies and food

---

Defendants' failure to comply with the local rules, will disregard Defendants' failure to submit a
statement of undisputed material facts, and will disregard the statement of undisputed facts
submitted with Defendants' reply brief.  Although Plaintiff submitted a 56.1 statement in
conformance with the Local Civil Rule, the Court has reviewed the record to decide the motions.

products is sufficient to establish the first prong of enterprise coverage.  *See Gomez v. El Rancho de Andres Carne de Tres Inc.*, No. 12-CV-1264, 2014 WL 1310296, at \*3 (E.D.N.Y. Mar. 11, 2014) (food products), *report and recommendation adopted*, No. 12-CV-1264, 2014 WL 1310299 (E.D.N.Y. Mar. 31, 2014); *Rodriguez*, 784 F. Supp. 2d at 121 (cleaning products) (citing *Locke v. St. Augustine's Episcopal Church*, 690 F. Supp. 2d 77, 88 (E.D.N.Y. Mar. 3, 2010)); *see also Jones v. E. Brooklyn Sec. Servs. Corp.*, No. 11-CV-1021, 2012 WL 3235784 at \*4 (E.D.N.Y. Aug. 7, 2012) ("[E]nterprise coverage applies so long as some of the employees wear uniforms or use items such as radios, books, flashlights, clipboards, brooms, bags, and cleaning supplies that have moved in interstate commerce.") (citations omitted).

In this case, Defendants do not directly address the first prong of the definition of "enterprise," arguing solely that "[c]ompanies which have less than the specified dollar amount of gross sales or business are not considered 'an enterprise' within the meaning of the FLSA."[10]

---

[10]  It is not entirely clear whether the section of Defendants' brief titled "Plaintiff Was Not Employed in Commerce" is addressed to the first prong of the enterprise coverage theory, or is addressed solely to the individual coverage theory. (*See* Def. Mem. 5.)  Although Defendants begin this section by asserting that "Plaintiffs . . . clearly cannot satisfy the FLSA enterprise requirement," the portion of the statute and case law cited by Defendants refer to individual coverage rather than enterprise coverage.  Even assuming that Defendants raise this argument to show that Plaintiffs have not met the first prong of the enterprise theory, their argument only addresses the first part of this disjunctive prong.  Defendants address the possibility that an employer has employees "engaged in commerce or in the production of goods for commerce," but does not account for the second possibility provided in the statute — that the employer "has employees handling, selling, or otherwise working on goods or materials that have been moved in or produced for commerce by any person."  29 U.S.C. § 203(s)(1)(A)(i).  Defendants also rely on cases addressing whether a plaintiff was "engaged in commerce" for purposes of establishing individual coverage.  *See Xelo v. Mavros*, 2005 WL 2385724, at \*4 ("Since Rock N' Roll Bagels fails to meet the FLSA's enterprise requirements, plaintiff's first claim can survive summary judgment only if plaintiff was 'engaged in commerce or in the production of goods for commerce.'"); *Lamont*, 2001 WL 521815, at \*3–4 (finding that "[n]either Plaintiff nor his employer engaged in the type of commercial activity Congress chose to regulate" and that "[t]he enterprise theory is not applicable to this case because Frank's did not have an annual gross volume of sales of at least $500,000.00 during the relevant time period").  These cases do not

(Def. Mem. 4.)  The Amended Complaint alleges that Rocha "regularly handles goods in interstate commerce, such as dishwashing liquid, olive oil and meat, and other supplies produced outside of the State of New York."  (Am. Compl. at 9 ¶ 39.)  This is sufficient to establish the first prong.

### ii.    Plaintiffs have raised disputed issues of fact as to the second prong of enterprise coverage

Because Plaintiffs have shown that the Restaurant meets the first prong of an enterprise engaged in commerce, the question of Defendants' enterprise liability is determined by the second prong of the definition, whether Defendants have "annual gross volume of sales made or business done" of at least $500,000."  29 U.S.C. § 203(s)(1)(A)(ii).  *See Jones*, 2012 WL 3235784 at *4 n.6 ("It should not come as a surprise that, given the expansiveness of this test, 'virtually every enterprise in the nation doing the requisite dollar volume of business is covered by the FLSA.'" (quoting *Archie v. Grand Cent. P'ship, Inc.*, 997 F. Supp. 504, 530 (S.D.N.Y. 1998)).  Defendants argue that "the incontrovertible evidence" in this case establishes that the Restaurant did not take in annual gross revenues of at least $500,000.  (Def. Mem. 4.) Defendants point to tax returns for the Restaurant for each year between 2007 and 2012, as well as "register receipts," to argue that the Restaurant did not earn revenues in excess of $500,000.[11] (Def. Mem. 4.)  Plaintiffs argue that the lack of reliability of the tax returns, Defendants' reliance on unauthenticated receipts, and evidence offered by Plaintiffs that Bakhtar's gross revenues were in excess of $500,000 create a genuine issue of material fact as to whether Bakhtar earned

---

address FLSA coverage where the plaintiff has "handl[ed] . . . or otherwise work[ed] on goods or materials that have been moved in or produced for commerce by any person."  *See* 29 U.S.C. § 203(s)(1)(A)(i).

[11]  Defendants also make reference to "payroll records," as supporting their argument, (*see* Def. Reply 8), but no such records are attached.

enough revenue to meet the FLSA definition of "enterprise." (Rocha Opp'n Mem. 9–13; Portillo Opp'n Mem. 3–8.)  The Court agrees with Plaintiffs.

### 1. Defendants' tax returns are not signed or authenticated

Defendants submit U.S. Corporation Income Tax Return forms (Form 1120) for the years 2007–2012.[12]  (*See* Exs. 1–6 annexed to Affidavit of Nawaz Khan-Nabi.)  According to the tax returns, the maximum "gross receipts or sales" for these years was $230,147, earned in 2012. (2012 Form 1120, annexed to Khan-Nabi Aff. as Ex. 6 at 1.)  Defendants also submit register receipts for what appears to be the third quarter of 2013 (June through August), and argue in their memorandum of law that these "reflect the same rate of income as listed in the tax returns."[13]  (Def. Mem. 4.)  Plaintiffs note that only tax returns for the years 2007 and 2008 are signed; the returns for the years 2009 through 2012 are not signed, nor accompanied by a statement or affidavit of the tax preparer.[14]  (*Id*. at 11).  The absence of a signature on the tax returns, combined with the absence of an affidavit from the tax preparer or from the owner of the business verifying the authenticity of the returns caution against presuming their authenticity. *See Monterossa v. Martinez Rest. Corp.*, No. 11-CV-3689, 2012 WL 3890212, at *4 (S.D.N.Y. Sept. 7, 2012) ("[T]here is good reason to be cautious in relying on Defendants' tax returns because . . . the submitted returns are unsigned and unaccompanied by a statement or affidavit of

---

[12]  Plaintiffs note that the years 2007–2009 are "not at issue, since they are not within the three year statute of limitations under the FLSA."  (Rocha Opp'n Mem. 9 n.2.)

[13]  Defendants do not provide a total amount based on the 99 pages of receipts.  Plaintiffs note that these receipts are unauthenticated, as there is no reference to them in the accompanying affidavit.  (Portillo Opp'n Mem. 3.)

[14]  The 2009 and 2010 forms include the words "Self-Prepared" next to the box labelled "Paid Preparer," while the 2011 and 2012 signature and paid preparer boxes are blank.  (*See* 2009–2011 Forms 1120, annexed to Khan-Nabi Aff. as Exs. 3–6.)

the tax preparer.").  Moreover, Plaintiffs have sufficiently challenged the reliability of the information contained in the tax returns, as discussed below.

### 1.  Plaintiffs' sworn statements contradict the tax returns

Plaintiffs argue that the tax returns are unreliable because the reported salaries and wages paid by the business in 2010 ($10,050), 2011 ($31,200), and 2012 ($39,980) are very low for a company that had at least 12 full-time employees working at all relevant times.  (Rocha Opp'n Mem. 10 (citing 2010–2012 Forms 1120, annexed to Khan-Nabi Aff. as Exs. 4–6).)  Plaintiffs assert that Rocha and Calel earned more in 2012 than is reported on the tax returns as total salaries and wages paid by the Restaurant for that year, (*id.*), and that Portillo was paid $20,000 each year, (Portillo Opp'n Mem. 4).  Defendants argue that Plaintiff's contention is "grossly misguided," asserting that Calel and Portillo "worked for less than three months, and Rocha worked in spurts, sometimes a few days or a few weeks at a time."  (Def. Reply 6.)  Defendants argue that the calculations reflect "full time employment for all Plaintiffs simultaneously and that claim is patently false."  (*Id.*)  Plaintiffs' sworn statements indicate the start and end dates of their employment, how many hours and days they worked in a week and how much they earned each week, but do not directly state how many weeks they worked in 2012, nor do they directly state how much they earned in 2012.  (*See* Rocha Decl. ¶¶ 5–6; Calel Decl. ¶¶ 4–5; Portillo Aff. ¶¶ 4–5.)  Rather, Plaintiffs' memoranda of law appear to calculate this amount based on their sworn statements.  Plaintiffs' sworn statements, including the statement that the Restaurant employed between 12 and 13 full-time employees at any given time, is sufficient to raise genuine issues of material facts regarding the reliability of the Restaurant's tax returns.

Plaintiffs also assert that the tax returns falsely report the rent the Restaurant paid as $30,000 in 2010, $42,000 in 2011, and $52,000 in 2012, when the lease for the premises shows that Defendants paid a base rent of $120,000 each year beginning on July 1, 2011.  (Portillo

Opp'n Mem. 4–5; Rocha Opp'n Mem. 11 (citing Agreement of Lease dated July 1, 2011, annexed to affidavit of Joshua Androphy as Ex. A at 1).) Defendants do not dispute that the lease provides for a monthly rent of $10,000, but assert that "Abaseen Food Corp. acquired Bakhter Afghan Kebabs and paid to acquire its lease rights. Pursuant to IRS tax code, Abaseen was well within its rights to amortize those costs over the life of the lease. The reduced Rents line reflects that amortization." (Def. Reply 7 (citing IRS Tax Publication 535, Ch. 8).)[15] Defendants do not cite to the language from the cited publication to substantiate why the amortization of the unspecified amount paid by Abaseen Food Corp. to acquire the rights to the lease would be properly entered in the "Rents" line of its tax return. Even if true, the lease, which is the only relevant document in the record, shows that Defendants contracted to pay $120,000 each year in rent beginning on July 1, 2011, an amount that is higher than was reported in the 2011 and 2012 tax returns, undermining the reliability of the tax returns.

In addition, Portillo submits an affidavit stating that during the time he was employed by Defendants, from April 18, 2011, through June 23, 2014, he observed that the Restaurant was open 365 days each year, from 11:00 a.m. to 11:00 p.m. on weekdays, and to 12:00 midnight on weekend days. (Portillo Aff. ¶¶ 3, 9.) Portillo states that at any given time there were at least 12 full time employees working in the Restaurant, all of whom were paid in cash "off the books." (*Id.* ¶¶ 10–11.) According to Portillo, the Restaurant had 36 tables in the main dining area and served more than 200 meals each day to both in-restaurant and take-out customers. (*Id.* ¶¶ 10, 13.) The average cost of one of these meals was $11 to $12. (*Id.* ¶ 12.) Portillo "personally observed that the Restaurant's cash sales were more than $2,200 per day." (*Id.* ¶ 15.) In

---

[15] Defendants do not provide a copy of the cited publication with their moving papers.

addition, the Restaurant had a separate room for private parties with a capacity for more than 100 guests, in which it served approximately three parties each week. (*Id.* ¶¶ 10, 16.)

Rocha also submits an affidavit stating that, during the time he worked at the Restaurant, from 2006 through January, 2013, there were at least thirteen full time employees at any given time, nine of whom worked in the kitchen and four of whom worked waiting tables, and all of whom were paid in cash. (Affidavit of Magdaleno Rocha, ("Rocha Aff.") ¶¶ 4, 10, 12.) According to Rocha, the Restaurant served more than 200 meals each day in the Restaurant, and 100 meals each day for customers to take out of the Restaurant. (*Id.* ¶ 14.) In connection with his job duties of preparing plates with cooked food to serve eat-in customers of the Restaurant, Rocha would receive a food order ticket from the cook. (*Id.* ¶ 15.) Rocha submits approximately 93 undated order slips, declaring that these are "a single day's order slips for eat-in orders, from a day in January 2013.[16] (*See* Restaurant receipts, annexed to Rocha Aff. as Ex. A.) Rocha observed that the Restaurant's cash sales were more than $2,700 each day, not including the income from the approximately two parties each week that were held in the Restaurant's private party room. (Rocha Aff. ¶ 18.)

Plaintiffs' evidence challenges the reliability of the Restaurant's stated yearly income as set forth in the tax returns, and therefore raises genuine issues of material fact as to whether the Restaurant earned over $500,000 in gross sales for each of the years from 2010 through 2012. *See Chang Mei Lin v. Yeh's Bakery, Inc.*, No. 12-CV-2146, 2013 WL 867436, at *3 (E.D.N.Y. Mar. 7, 2013) (finding that the defendants' "tax returns fall short of establishing as a matter of law that the annual gross income of the bakery falls below the FLSA threshold," where the plaintiff proffered evidence including the plaintiff's W-2 forms and her sworn statement about

---

[16] Plaintiff does not provide a total amount based on the 93 pages of receipts.

the number of food products she helped prepare each day and the average cost of each);

*Monterossa*, 2012 WL 3890212, at \*3–4 (S.D.N.Y. Sept. 7, 2012) (finding that the plaintiffs met

their burden at the summary judgment stage, despite the defendants' submission of tax returns

showing annual gross revenues well below $500,000, by proffering evidence that the tax returns

were "inconsistent with Defendants' own records," a handwritten log of the Restaurant's

expenses and wages, as well as with sworn statements of employees as to the defendants' daily

gross revenue); *Amaya v. Superior Tile & Granite Corp.*, No. 10-CV-4525, 2012 WL 130425, at

\*4–5 (S.D.N.Y. Jan. 17, 2012) (denying summary judgment and finding the defendant's tax

returns "entirely unreliable" where they were "utterly inconsistent with a business employing six

to eight workers full time, each earning $35,000 or more annually," and where the defendant

"operated largely a cash business").

Defendants attack the credibility of Plaintiffs' assertions, citing purported inconsistencies

between Plaintiffs' declarations and the Amended Complaint regarding the fact that Plaintiffs

claim to have seen customers, and argue that Plaintiffs "do not state whether each customer made

a purchase, individually or collectively." (*See* Def. Reply 6–7.) Defendants also dispute that

there were 12 to 13 full-time employees at any given time, arguing instead that "Plaintiffs offer

no evidence to support their contention" that there were this many employees, and noting that

Calel and Portillo "worked for less than three months," and that Rocha "worked in spurts,

sometimes a few days or a few weeks at a time." (Def. Reply 6.) Defendants contend that "[i]t

is much more credible that Defendants did not employ dozens of people and kept their overhead

low, in line with their earnings." (*Id.*) Defendants' arguments that Plaintiffs' sworn statements

are not credible and their statements that the Court should determine that they are "much more

credible" underscores the disputed facts that cannot be resolved on Defendants' motion for

summary judgment.  Because there are genuine, disputed issues concerning whether the Restaurant earned at least $500,000 in annual revenues during the time period of Plaintiffs' FLSA claims, the Court denies Defendants' motion for summary judgment as to Plaintiff's FLSA claims.

### d.  Defendants' motion to dismiss the New York Labor Law claims

Defendants argue that Plaintiffs' claim for overtime compensation under New York state law should be dismissed because "the New York Legislature has not created any right to compensation for overtime hours worked by employees such as Plaintiff," and the overtime regulation promulgated by the New York Commissioner of Labor is "the product of an impermissible delegation of lawmaking authority."  (Def. Mem. 8–10.)  Plaintiffs respond that Defendants' assertion that they have no right to overtime pay under New York law has been rejected by several state and federal courts and that the overtime regulations are lawful.  (Rocha Mem. 15–19.)  The Court agrees with Plaintiffs.

### i.  New York state law provides for overtime compensation

Defendants argue that "there is no applicable statutory entitlement to overtime compensation," because the New York State Legislature has not created any such right.  (Def. Mem. 7.)

In enacting the Minimum Wage Act, the New York State Legislature ("the Legislature") enacted specific minimum wages, *see* N.Y. Lab. L. § 652, but did not directly enact an overtime provision.  Instead, the Legislature delegated authority to the New York State Commissioner of Labor ("Commissioner") to issue "regulations governing . . . overtime ."  N.Y. Lab. L. § 655–56. Pursuant to the authority delegated to the Commissioner by the Legislature, the Commissioner promulgated regulations governing overtime.  *See, e.g.*, 12 Comp. Codes R. & Regs. §§ 142-2.2 (providing overtime wage for "miscellaneous industries and occupations); 146-1.4 (hospitality

industry). Specifically, the Legislature empowered the Commissioner to investigate whether the established minimum wages were adequate, and if such investigation caused the Commissioner to determine that minimum wages were "insufficient to provide adequate maintenance and to protect . . . health," then the Commissioner is directed to "appoint a wage board to inquire into and report and recommend adequate minimum wages and regulations for employees" N.Y. Lab. L. § 653(1). Section 655 of the statute also provides that "[i]n addition to recommendations for minimum wages, the wage board may recommend such regulations as it deems appropriate to carry out the purposes of this article and to safeguard minimum wages," and provides that [s]uch recommended regulations may also include, but are not limited to, regulations governing . . . overtime ." *Id*. § 655(5)(b). The Legislature imposed a duty on the Commission to take action on any of the wage board's report and recommendations.[17] *Id*. § 656 ("[T]he commissioner shall by order accept or reject the [wage] board's report and recommendations.").

The overtime regulation promulgated by the Commissioner provides that "[a]n employer shall pay an employee for overtime at a wage rate of one and one-half times the employee's regular rate in the manner and methods provided in and subject to the exemptions of" the overtime provisions of the FLSA. 12 N.Y. Comp. Codes R. & Regs. § 142-2.2. This regulation

---

[17] As one New York Supreme Court, Appellate Division (Second Department) decision observed:

> There are no provisions governing overtime compensation in the New York State Labor Law. Instead, Labor Law § 653 specifically provides that the Commissioner of Labor has the power to investigate the sufficiency of the minimum wage, and if the Commissioner is of the opinion that the minimum wage is insufficient, he must appoint a wage board to inquire into and report and recommend adequate minimum wages. In addition to making recommendations regarding minimum wages, the wage board may recommend such regulations as it deems appropriate with respect to, *inter alia,* overtime rates.

*Ballard v. Cmty. Home Care Referral Serv., Inc.*, 695 N.Y.S.2d 130, 131 (App. Div. 1999).

has been widely recognized as comprising New York state law. *See Nakahata v. New York-Presbyterian Healthcare Sys., Inc.*, 723 F.3d 192, 200 (2d Cir. 2013) ("[T]he NYLL adopts th[e] same standard . . . [as the] FLSA definition of overtime into the [New York Labor Law]" (citing 12 Comp. Codes R. & Regs. § 142-2.2); *Ramos v. Baldor Specialty Foods, Inc.*, 687 F.3d 554, 556 (2d Cir. 2012) ("Like the FLSA, the NYLL 'mandates overtime pay and applies the same exemptions as the FLSA.'" (quoting *Reiseck v. Universal Commc'ns of Miami, Inc.*, 591 F.3d 101, 105 (2d Cir. 2010))); *Zheng v. Liberty Apparel Co. Inc.*, 355 F.3d 61, 78 (2d Cir. 2003) ("The overtime compensation claim under § 142-2 is governed by the definitions in [12 Comp. Codes R. & Regs.] § 142-2.16, and the minimum wage claim under § 652(1) is governed by the definitions in New York Labor Law § 651."); *Bonito v. Avalon Partners, Inc.*, 967 N.Y.S.2d 19, 20 (App. Div. 2013) ("Plaintiffs may also assert claims against [a defendant] for violations of the New York Minimum Wage Act (Labor Law § 650 *et seq.*) and its implementing regulations, including 12 NYCRR 142-2.2."); *Anderson v. Ikon Office Solutions, Inc.*, 833 N.Y.S.2d 1, 1 (2007) ("§ 142-2.2 provides that under the state minimum wage act (Labor Law § 650 *et seq.*), overtime shall be paid at 1½ times the regular rate, subject to any exceptions in the federal statute.").

Defendants rely on an appellate division and two district court cases, *Hornstein v. Negev Airbase Constructors*, 488 N.Y.S.2d 435 (App. Div. 1985), *Gallegos v. Brandeis Sch.*, 189 F.R.D. 256, 259 (E.D.N.Y. 1999), and *Diaz v. Electronics Boutique of Am., Inc.*, No. 04-CV-0840E, 2005 WL 2654270 (W.D.N.Y. Oct. 17, 2005), to argue that "New York does not have a mandatory overtime law." (Def. Mem. 7–8.) *Hornstein* and *Gallegos* rely on New York Labor

Law § 160 to find that "New York does not have a mandatory overtime law."[18] *Hornstein*, 488 N.Y.S.2d at 437; *Gallegos*, 189 F.R.D. at 259 (citing *Hornstein*, 488 N.Y.S. at 437).  However, § 160 is not the only provision of the New York Labor Law to discuss overtime, and it appears that the *Hornstein* and *Gallegos* courts did not look to any other provision of New York law. The Court therefore declines to follow these cases.[19]  As discussed above, § 655 authorizes the wage board to recommend regulations governing overtime, while § 656 directs the Commissioner to either accept or reject any regulations recommended by the wage board, and, pursuant to this delegated authority, there are regulations governing overtime pay.  *See, e.g.*, §§ 142-2.2; 146-1.4; *see also Ahmed v. Subzi Mandi, Inc.*, No. 13-CV-3353, 2014 WL 4101224, at *3 (E.D.N.Y. May 27, 2014) ("NYLL's overtime provision specifies that eight hours constitutes a 'legal day's work,' N.Y. Lab. L. § 160, and that '[a]n employer shall pay an employee for overtime at a wage rate of one and one-half times the employee's regular rate . . . ." (citing 12 N.Y. Comp. Codes R. & Regs. § 142-2.2)), *report and recommendation adopted*, No. 13-CV-3353, 2014 WL 4101247 (E.D.N.Y. Aug. 18, 2014); *Ray v. Debt Free Nation, Inc.*, No. 11-CV-7316, 2014 WL 957023, at *4 (S.D.N.Y. Mar. 11, 2014) ("'New York does not have a mandatory overtime law.'  Instead, the Commissioner of Labor issued a Minimum Wage Order

---

[18]  *Diaz* came to the opposite conclusion and therefore does not support Defendants' claim.  *See Diaz v. Electronics Boutique of Am., Inc.*, No. 04-CV-0840E, 2005 WL 2654270, at *8 (W.D.N.Y. Oct. 17, 2005) (rejecting the defendants' assertion that "there is no New York State overtime statute and the corresponding regulation, [12 Comp. Codes R. & Regs. § 142-2.2], is thus illegitimate").

[19]  *See Archibald v. Marshalls of MA, Inc.*, No. 09-CV-2323, 2009 WL 3817404, at *2 (S.D.N.Y. Nov. 12, 2009) (criticizing *Hornstein* for "fail[ing] to cite any authority to support th[e] proposition" that New York does not have a mandatory overtime law, and finding that "Defendants' reliance on [*Gallegos*] is similarly unavailing, as that case simply relies on *Hornstein* and provides no further basis for its decision"); *Diaz*, 2005 WL 2654270, at *8 ("Neither the *Hornstein* nor the *Gallegos* decision explains or justifies the proposition" that New York does not have a mandatory overtime law.).

for Miscellaneous Industries and Occupations, providing that '[a]n employer shall pay an employee for overtime at a wage rate of one and one-half times the employee's regular rate.'" (citing *Hornstein*, 488 N.Y.S.2d at 437 and 12 N.Y. Comp. Codes R. & Regs. § 142-2.); *Fernandez v. Main Glatt Corp.*, No. 12-CV-986, 2014 WL 1310287, at *2 n.2 (E.D.N.Y. Mar. 14, 2014) ("New York law also provides that: '[a]n employer shall pay an employee for overtime at a wage rate of one and one-half times the employee's regular rate.'" (citing 12 N.Y. Comp. Codes R. & Regs. § 142-2.2 and N.Y. Lab. L. §§ 160)), *report and recommendation adopted sub nom. Hernandez v. Main Glatt Corp.*, No. 12-CV-986, 2014 WL 1310291 (E.D.N.Y. Mar. 31, 2014); *Stennett v. Moveway Transfer & Storage, Inc.*, 949 N.Y.S.2d 91, 94 (App. Div. 2012) (finding that the plaintiff's claim for failure to pay overtime wages "is premised upon the minimum wage directives set forth in 12 NYCRR 142-2.2, which were promulgated by the New York State Commissioner of Labor pursuant to authority vested in the Commissioner" (citing *Ballard v. Community Home Care Referral Serv.*, 695 N.Y.S.2d 130 (App. Div. 1999))). In light of the extensive authority to the contrary, Defendants' argument that there is no right to overtime under New York law is without merit.[20]

---

[20] Based on the Court's ruling that New York state law does provide a right to overtime, Defendants' argument that Plaintiffs may prevail on their overtime claim only if they establish a contractual right is moot. (*See* Def. Mem. 8; Def. Reply 9.) The Court also notes that the cases relied on by Defendants are inapposite as they address New York Labor Law § 191, a section not at issue in the case before the Court. Both *Miller v. Hekimian Labs., Inc.*, 257 F. Supp. 2d 506 (N.D.N.Y. 2003) and *Tierney v. Capricorn Investors, L.P.*, 592 N.Y.S.2d 700 (1993) addressed claims brought by plaintiffs seeking payment of sales commissions pursuant to § 191, which provides that "[a] commission salesperson shall be paid the wages, salary, drawing account, commissions and all other monies earned or payable in accordance with the agreed terms of employment." Both courts held that, because the plaintiffs failed to establish that they had earned or were entitled to monies under their "agreed terms of employment," they also failed to establish a right to damages under this statutory provision. *See Miller*, 257 F. Supp. at 518, *aff'd*, 85 F. App'x 266 (2d Cir. 2004); *Tierney*, 592 N.Y.S.2d at 703. Here, Plaintiffs do not seek payment of sales commissions and do not invoke § 191.

### ii. The New York State Legislature's delegation of authority to the Commissioner is constitutional

Defendants argue that the Legislature's delegation of authority to the Commissioner to establish the overtime regulation runs afoul of the New York State Constitution's provision that "[t]he legislative power of this state shall be vested in the senate and assembly." (Def. Mem. 8 (citing N.Y. Const. art. III, § 1).) Defendants argue that "the Legislature makes the fundamental policy decisions for residents and businesses in this State, and cannot delegate those decisions to administrative agencies such as the New York State Department of Labor." (*Id*. at 8–9 (citing *Boreali v. Axelrod*, 71 N.Y.2d 1 (1987) and *Health Ins. Ass'n of Am. v. Corcoran*, 551 N.Y.S.2d 615 (App. Div. 1990), *aff'd*, 76 N.Y.2d 995 (1990)).

Although the New York State Constitution vests "legislative power" solely in the Legislature, *see* N.Y. Const. art. III, § 1, the delegation of discretionary authority from legislative bodies to administrative agencies to implement and execute legislation is a well-established principle essential to the functioning of the modern polity. *See Darweger v. Staats*, 267 N.Y. 290, 306 (1935) ("The law books are full of statutes unquestionably valid, in which the Legislature has been content to simply establish rules and principles, leaving execution and details to other officers."); *see also Raffellini v. State Farm Mut. Auto. Ins. Co.*, 9 N.Y.3d 196, 201 (2007) ("It is well settled that the Legislature may authorize an administrative agency to fill in the interstices in the legislative product by prescribing rules and regulations consistent with the enabling legislation." (citation and internal quotation marks omitted); *Dorst v. Pataki*, 90 N.Y.2d 696, 699 (1997) ("The Legislature is free to announce its policy in general terms and authorize administrators 'to fill in details and interstices and to make subsidiary policy choices consistent with the enabling legislation.'" (quoting *Citizens for an Orderly Energy Policy, Inc. v. Cuomo*, 78 N.Y.2d 398, 410 (1991))); *Levine v. Whalen*, 39 N.Y.2d 510, 515 (1976) ("[T]here is

no constitutional prohibition against the delegation of power, with reasonable safeguards and standards, to an agency or commission to administer the law as enacted by the Legislature."). Although the delegation of discretion must "limit[] the field in which that discretion is to operate and provides standards to govern its exercise," *Levine*, 39 N.Y.2d at 515, New York courts have upheld statutes providing even the most generalized standards and boundaries. *See, e.g.*, *Levine*, 39 N.Y.2d at 516 (holding that the standard provided in a public health law, "'to provide for the protection and promotion of the health of the inhabitants of the state," is not so vague and indefinite as to set no standard or to outline no policy"); *Med. Soc'y of State v. Serio*, 100 N.Y.2d 854, 864–65 (2003) (holding that a provision in New York Insurance Law providing that "[t]he superintendent shall have the power to prescribe and from time to time withdraw or amend, in writing, regulations, not inconsistent with the provisions of [the Insurance Law] . . . does not cede to the executive branch fundamental legislative or policymaking authority, which remains at all times with the Legislature").

Here, New York Labor Law empowers the Commissioner to investigate whether established minimum wages "are sufficient to provide adequate maintenance and to protect the health of the persons employed," in various occupations, and authorizes a Commissioner-appointed wage board to "recommend such regulations as it deems appropriate to carry out the purposes of this article and to safeguard minimum wages . . . [including] regulations governing . . . overtime." N.Y. Lab. L. §§ 650, 655. These limiting principles are sufficient to circumscribe the Commissioner's discretion in implementing the legislation. Therefore, the Legislature's delegation of authority to the Commissioner to implement the provisions of the

minimum wage law does not violate the constitutionally-mandated separation of powers.[21]  In

light of the well-established principle that the Legislature may declare a broad policy and

delegate authority to provide specificity in administering the policy, Defendants' argument that

the Legislature improperly delegated its authority to create a mandatory overtime law is without

merit.  *See Gen. Elec. Capital Corp. v. New York State Div. of Tax Appeals*, 2 N.Y.3d 249, 254

(2004) ("[T]he Legislature may declare its will, and after fixing a primary standard, endow

administrative agencies with the power to fill in the interstices in the legislative product by

---

[21] Where courts have struck down legislation in the state of New York, they have done so because of the promulgating agency overstepped its delegated authority and not because the legislative body impermissibly delegated its legislative power.  Defendants' reliance on *Boreali v. Axelrod*, 71 N.Y.2d 1 (1987) and *Health Ins. Ass'n of Am. v. Corcoran*, 551 N.Y.S.2d 615 (App. Div. 1990), *aff'd*, 76 N.Y.2d 995 (1990), is inapposite.  In *Boreali*, the New York Court of Appeals noted that "the Legislature cannot pass on its law-making functions to other bodies . . . but there is no constitutional prohibition against the delegation of power, with reasonable safeguards and standards, to an agency or commission to administer the law as enacted by the Legislature."  *Boreali*, 71 N.Y.2d at 10 (quoting *Levine v. Whalen*, 39 N.Y.2d 510, 515 (1976)). The court struck down a regulation enacted by the Public Health Council (PHC), an administrative agency, as failing to fall within its *properly delegated authority*.  *See id.* at 11. Notably, the court did not find that the Legislature had unconstitutionally delegated authority to the agency to promulgate applicable regulations, as Defendants assert.  *See id.* ("[T]he precise provision that is at issue in this case — Public Health Law § 225(5)(a) — has been upheld against a constitutional challenge based upon the 'nondelegation' doctrine.").  Instead, the court found that the agency had overstepped its properly delegated authority.  *See id.* (holding that a "number of coalescing circumstances . . . when viewed in combination, paint a portrait of an agency that has improperly assumed for itself  the open-ended discretion to choose ends which characterizes the elected Legislature's role in our system of government" (alteration, citation and internal quotation marks omitted)); *see also Rent Stabilization Ass'n of New York City, Inc. v. Higgins*, 83 N.Y.2d 156, 169 (1993) ("In *Boreali,* we concluded that the difficult-to-demarcate line between administrative rulemaking and legislative policymaking had been transgressed, and invalidated regulations promulgated by the Public Health Council prohibiting indoor smoking in specified public areas on the ground that the regulatory scheme was improperly based upon policy considerations originating with the agency and not the legislature.").  Similarly, in *Corcoran* the New York Supreme Court, Appellate Division (Third Department) noted that while it did not "imply that, under the separation of powers doctrine, the Legislature could not have delegated broad power to [the Commissioner of Insurance] to alter accepted insurer underwriting practices in order to implement a legislative policy . . . ." it found that the Commissioner "exceeds his authority when, by regulation, he 'effect[s] [his own] vision of societal policy choices."  *Corcoran*, 551 N.Y.S.2d at 622.

prescribing rules and regulations consistent with the enabling legislation . . . ." (quoting *Nicholas v. Kahn*, 47 N.Y.2d 24, 31 (1979))).

### iii.   The Commissioner lawfully exercised his rulemaking authority

Defendants argue that the Commissioner overstepped the authority delegated to him in imposing "substantive obligations upon employers beyond that required by the Legislature." (Def. Mem. 9.)  Defendants concede that the administrative agency here operates under the authority of a "broad enabling statute," but contend that the Commissioner cannot "stretch that statute" to "draft[] a code embodying its own assessment of what public policy ought to be." (*Id*.; *see also* Def. Reply 9.)

Regulations promulgated by administrative agencies pursuant to legislatively delegated authority are upheld unless they "exceeded the scope of [their] constitutional authority by engaging in inherently legislative activity." *Serio*, 100 N.Y.2d at 865; *see Gen. Elec. Capital Corp.*, 2 N.Y.3d at 254 ("[A]n administrative agency may not, in the exercise of rule-making authority, engage in broad-based public policy determinations.").  Administrative agencies must also operate within the substantive scope of the enabling legislation and refrain from enacting regulations that are not "in harmony with the statute's over-all purpose," and must have a rational basis for their regulations.  *Gen. Elec. Capital Corp.*, 2 N.Y.3d at 254 ("[W]here an agency adopts a regulation that is consistent with its enabling legislation and is not so lacking in reason for its promulgation that it is essentially arbitrary the rule has the force and effect of law." (citations and internal quotation marks omitted)); *see also Raffellini*, 9 N.Y.3d at 201 ("[A]n agency can adopt regulations that go beyond the text of that legislation, provided they are not inconsistent with the statutory language or its underlying purposes.  A duly promulgated regulation that meets these criteria has the force of law." (citations omitted).

Here, contrary to Defendants' claims, there is no "broad-based policy determinations" that were made by the Commissioner in promulgating the overtime regulation. Rather, as provided by the enabling statute, the overtime regulation was adopted upon the recommendation of a wage board that had been appointed by the Commissioner during the course of his investigation into the adequacy of the established minimum wage law. *Cf.* New York State Department of Labor, "Notice of Adoption: Hotel and Restaurant Wage Orders" NYS Register, December 29, 2010 (adopting 12 Comp. Codes R. & Regs. § 146 pursuant to N.Y. Lab. L. §§ 21(11), 199, 653, 656). New York Labor Law authorizes the Commissioner to adopt the recommendations of the wage board regarding overtime regulations as part of his mandate to "carry out the purposes of [the minimum wage law] and to safeguard minimum wages." N.Y. Lab. L. §§ 655, 656. In addition, the statute requires the Commissioner and the wage board to "consider the amount sufficient to provide adequate maintenance and to protect health" in establishing minimum wages and regulations, and specifically authorizes the wage board to make a recommendation regarding overtime. *Id.* §§ 654, 655. By adopting an overtime regulation, the Commissioner did not act in a manner contrary to the Legislature's intent. *See id.* § 650 (stating the purpose of the minimum wage law to "eliminate[] as rapidly as practicable without substantially curtailing opportunities for employment or earning power" wages that are "insufficient to provide adequate maintenance for [workers]and their families").

Although New York courts have rarely struck down regulations as exceeding the scope of an agency's delegated authority, in *Boreali* the New York Court of Appeals struck down a regulation of the state Public Health Council (PHC) banning indoor smoking for four reasons: (1) although the council purported to be acting based on its authority to regulate public health,

the regulation was "laden with exceptions based solely upon economic and social concerns,"[22]

even though the council had not been authorized to trade off the costs and benefits of its health-

promoting actions,

> [(2)] in adopting the antismoking regulations challenged here the PHC did not merely fill in the details of broad legislation describing the over-all policies to be implemented [but rather] . . . wrote on a clean slate, creating its own comprehensive set of rules without benefit of legislative guidance, . . . [(3)] the agency acted in an area in which the Legislature had repeatedly tried — and failed — to reach agreement in the face of substantial public debate and vigorous lobbying by a variety of interested factions, . . . [and (4)] no special expertise or technical competence in the field of health was involved in the development of the antismoking regulations challenged here.

*Boreali*, 71 N.Y.2d at 12–14.  Similarly, in *Health Insurance Association of America v.*

*Corcoran*, 551 N.Y.S.2d 615 (1990), the New York Supreme Court, Appellate Division, noting

that "regulations must be consistent with and have a basis in the Insurance Law itself,"  struck

down a regulation enacted by the Commissioner of Insurance that prohibited insurance

companies from inquiring about an applicant's HIV status.  *Corcoran*, 551 N.Y.S.2d at 618.  The

court found that the Commissioner, who passed the regulation with the intent to prevent

discrimination in insurance coverage against people with HIV acted outside the scope of his

delegated authority because the regulation contradicted provisions in the enabling statute

specifying that "[n]othing herein contained shall require any insurer to insure every kind of risk

which it is authorized to insure," and because the regulation was outside the scope of the

Commissioner to prohibit insurance practices that are "unfair, inequitable, misleading or

---

[22]  The *Boreali* court noted that these exceptions "demonstrate the agency's own effort to weigh the goal of promoting health against its social cost and to reach a suitable compromise," but "the agency in this case has not been authorized to structure its decision making in a 'cost-benefit' model."  *Boreali*, 71 N.Y.2d at 12.

discriminatory [on the basis of race, color, etc.]." *Id*. at 618–19. The court concluded that "[w]ithout legislation more clearly suggesting that a specific, sound underwriting practice is condemned, an insurance regulation forbidding the practice is, in effect, a rule making illegal that which is permitted by law." *Id*. at 619.

In contrast to those cases, here, the New York State Legislature expressly authorized the wage board to recommend "such regulations as it deems appropriate to carry out the purposes of this article and to safeguard minimum wages . . . includ[ing] . . . regulations governing overtime." N.Y. Lab. L. § 655(5)(b). The Legislature specifically required the Commissioner to either adopt or reject the wage board's recommendations. *Id*. § 656. The Commissioner accepted the wage board's recommendations. Under these circumstances, the Commissioner was acting well within his delegated authority when he adopted the mandatory overtime regulation. *See Statharos v. N.Y.C. Taxi & Limousine Comm'n*, 198 F.3d 317, 322 (2d Cir. 1999) (rejecting the plaintiffs' argument that agency-imposed financial disclosure requirements were unconstitutional and noting that in *Boreali* "the court rested its holding on several 'coalescing circumstances' not present in this case"); *Serio*, 100 N.Y.2d at 865 ("The cornerstone of administrative law is derived from the principle that the Legislature may declare its will, and after fixing a primary standard, endow administrative agencies with the power to fill in the interstices in the legislative product by prescribing rules and regulations consistent with the enabling legislation. That occurred here." (alteration, citation and internal quotation marks omitted)); *Rent Stabilization Ass'n of New York City*, 83 N.Y.2d at 164 (distinguishing *Boreali* in rejecting the defendant's argument that the New York City Division of Housing and Community Renewal "overstepped its mandate and invaded the province of the legislature, in violation of the constitutional separation of powers" in enacting regulations providing protections from eviction

to family members of rent stabilized housing tenants). Contrary to Defendants' claim, the

Commissioner did not exceed his statutorily-delegated authority to adopt an overtime regulation

in enacting § 142-2.2.

### iv. The regulation does not impermissibly adopt federal law

The overtime regulation promulgated by the Commissioner provides that:

> An employer shall pay an employee for overtime at a wage rate of
> one and one-half times the employee's regular rate in the manner
> and methods provided in and subject to the exemptions of sections
> 7 and 13 of 29 U.S.C. 201 *et seq.*, the Fair Labor Standards Act of
> 1938, as amended; provided, however, that the exemptions set
> forth in section 13(a)(2) and (4) shall not apply.

12 Comp. Codes R. & Regs. § 142-2.2. Defendants argue that, by adopting the relevant

provisions of the FLSA and specifically referenced in the statute "as amended," in the overtime

regulation, the Commissioner "improperly abdicated rulemaking authority to spell out the terms

of a substantive state law . . . to the dictates of the United States Congress and the U.S.

Department of Labor."[23] (Def. Mem. 9–10.) Defendants argue that "such delegation is improper

because it permits future overtime regulations not yet promulgated by the U.S. Department of

---

[23] Plaintiffs argues that Defendants "mistakenly" refer to the overtime regulation
applicable to miscellaneous industries, 12 Comp. Codes R. & Regs. § 142-2.2, and note that the
correct overtime regulation applicable to Plaintiffs are § 146-1.4, the overtime regulation for
employees in the hospitality industry, including restaurant workers, which does not refer to the
FLSA or federal standards. (Rocha Opp'n Mem. 19.) While Plaintiffs are likely correct that the
relevant regulation is § 146-1.4, both their Amended Complaint and Second Amended Complaint
invoke only § 142-2.2. (*See* Am. Compl. ¶ 87; Second Am. Compl. ¶ 88.) Thus any mistake in
citing and discussing the incorrect regulation is attributable to Plaintiffs, not Defendants. The
question of which regulation is applicable is not before the Court, and because Defendants have
not had the opportunity to make an argument as to any regulation other than § 142-2.2, the Court
addresses the merits of Defendants' argument. The Court notes, however, that § 146-1.4, which
requires overtime pay for workers in the hospitality industry, does not reference the FLSA or any
other federal law, but instead provides that "[a]n employer shall pay an employee for overtime at
a wage rate of 1½ times the employee's regular rate for hours worked in excess of 40 hours in
one workweek," and explains the manner and methods for payment. *See* 12 N.Y. Comp. Codes
R. & Regs. § 146-1.4.

Labor to automatically become the law of New York State, without undergoing the usual legislative review and adoption process."  (*Id.* at 9–10.)

The Court is unpersuaded that the term "as amended" as used in § 142-2.2 is intended to incorporate any and all amendments to the relevant FLSA provisions, as opposed to being a descriptive title of 29 U.S.C. 201 *et seq.*, which is commonly referred to as "the Fair Labor Standards Act of 1938, as amended," in recognition of the fact that the FLSA has been amended since its passage in 1938.  *See, e.g.*, *Feltner v. Columbia Pictures Television, Inc.*, 523 U.S. 340, 347 (1998) ("The ADEA's remedial provisions were expressly to be enforced in accordance with the Fair Labor Standards Act of 1938, as amended, 29 U.S.C. § 101 et seq."); *Kelly v. City of Mount Vernon*, 162 F.3d 765, 766 (2d Cir. 1998) ("This case arises under the Fair Labor Standards Act of 1938, as amended, 29 U.S.C. § 201 *et seq.*").  Indeed, in light of § 102 of New York Executive Law requiring the regulation to set forth a "precise identification" of the federal material being referenced, the inclusion of the term "as amended" can be understood as a descriptive rather than a prescriptive reference.[24]  The overtime regulation is not an open-ended adoption of "sections 7 and 13 of 29 U.S.C. 201 *et seq.*, the Fair Labor Standards Act of 1938, as amended" including any amendments made by Congress to those sections at any time in the future, but rather, it incorporates these sections as they existed at the time of the regulation's

---

[24]  New York State law allows for the referencing of federal law in the rules and regulations of state administrative agencies, provided they comply with certain procedural requirements.  N.Y. Exec. Law § 102.1.c ("Any code, rule or regulation which includes in the text thereof any United States statute, or code, rule or regulation previously published in the code of federal regulations or in the federal register. . . shall have set forth in its text a precise identification of such material . . . .").

enactment.[25]  *See Archibald*, 2009 WL 3817404, at *3 ("The regulation adopts the FLSA provisions as of the time of its enactment.").

The overtime regulations enacted by the Commissioner are a valid exercise of properly delegated authority. Defendants' motion for summary judgment as to Plaintiffs' state overtime claims is denied.

## III.  Conclusion

For the foregoing reasons, the Court denies Defendants' motion to dismiss and their alternate motion for summary judgment.

SO ORDERED:


_____s/MKB_____
MARGO K. BRODIE
United States District Judge


Dated: September 15, 2014
        Brooklyn, New York

---

[25]  Defendants' reliance on *Coca-Cola Bottling Co. of New York v. Bd. of Estimate of City of New York*, 72 N.Y.2d 674, 680 (1988) to argue that "state agencies may not properly delegate their obligations to other government bodies," is misplaced.  (Def. Mem. 9.)  In *Coca-Cola Bottling*, the New York Court of Appeals held that, where the State Environmental Quality Review Act (SEQRA) expressly required that the "lead agency" of any municipally-approved project conduct an environmental review of the project, the City of New York could not, by Mayoral executive order, bypass this requirement by designating a different agency to review municipal projects.  *See Coca-Cola Bottling*, 72 N.Y.2d at 681–82 ("[T]he operation of Executive Order No. 91 transgressed SEQRA's spirit, as well as its form. . . . [by] allow[ing] the Board of Estimate — the governmental entity responsible for the final policy decision to proceed with a project — to be insulated from consideration of environmental factors.  This violated a fundamental policy of SEQRA.").